**TEXAS COMMITTEE ON NATURAL RESOURCES, et al.**

v.

**Major General Hans VAN WINKLE, et al.**

**No. CIV.A. 4:00CV384-Y.**

United States District Court, N.D. Texas, Fort Worth Division.

April 10, 2002.

588

James B. Blackburn Jr., Blackburn Carter, Houston, TX, for Plaintiffs.

Lloyd Rex Crosswhite, Attorney at Law, U.S. Army Corps of Engineers, Howard Alan Borg, Assistant U.S. Attorney, Fort Worth, TX, for Defendants.

## ORDER PARTIALLY GRANTING PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

MEANS, District Judge.

Pending before the Court are two cross motions for summary judgment filed on July 6, 2001. Having carefully considered the motions, responses, and replies, the Court concludes that both motions should be PARTIALLY GRANTED in that Defendants[1] are entitled to summary judgment on all counts except count III(1), and upon which Plaintiffs[2] are entitled to summary judgment on count III(1).

---

1. The defendants in this suit are as follows: (1) Hans Van Winkle, Major General, Deputy Commander for Civil Works; (2) United States Army Corps of Engineers; (3) Louis Caldera, Secretary of the Department of the Army; and (4) James S. Weller, Colonel, District Engineer, United States Army Corps of Engineers, Fort Worth District.

2. The plaintiffs in this suit are as follows: (1) Texas Committee on Natural Resources, (2) the Sierra Club, (3) Friends of the Earth, (4)

## I. BACKGROUND

This suit arises out of Defendants' intent to construct the Dallas Floodway Extension ("DFE") project, a comprehensive floodcontrol project on the Trinity River running through the eastern portion of Dallas, Texas, and, most notably, immediately east and south of downtown Dallas. Plaintiffs allege that the Army Corps of Engineers's 1999 Environmental Impact Statement ("EIS") for the DFE project failed to comply with the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.* Plaintiffs seek an injunction that requires the Army Corps of Engineers ("COE") to prepare a new EIS before construction on the DFE project can proceed.

The DFE project was originally authorized for construction in 1965 by Section 301 of the Rivers and Harbors Act (P.L. 89–298) as one of five local flood protection projects. (Defs.' Mem. Br. in Supp. of Cross Mot. for Summ. J. ("Defs.' Mem.") at 1; Hard Copy Administrative Record ("HCAR") at 3.) In the early 1980s, however-

er, the project was placed on the inactive list after being rejected by Dallas voters in a bond election. (Pls.' Br. in Supp. of Mot. for Summ. J. ("Pls.' Br.") at 2.)

In 1987, due to concerns over flooding and the potential for increased development, the COE undertook a comprehensive review of flooding on the Trinity River and issued a regional Environmental Impact Statement ("1987 REIS") that identified the existing flood levels on the Trinity River from above Fort Worth to below Dallas and was to serve as a permitting strategy for the Trinity River and its tributaries.[3] (Pls.' Br. at 1; Defs.' Mem. at 2.) In a Record of Decision, dated April 29, 1988 ("1988 ROD"), the recommendations of the 1987 REIS were adopted by the District Engineer for implementation by the Forth Worth District COE. (Defs.' Mem. at 2.) According to Plaintiffs, the "1988 ROD established policies that were to be followed by the Corps and by applicants for Corps' permits to prevent the flood levels associated with the Trinity River from increasing." (Pls.' Br. at 1.)

---

Dallas County Audubon Society, (5) the Dallas Historic Tree Coalition, (6) Taxpayers for Sensible Priorities, (7) Citizens for a Safe Environment, (8) Save the Trinity, (9) Rainbow Bridge, Inc., (10) Friendship Homeowners Association for Environmental Justice, (11) Parkdale Heights Neighborhood Association, (12) Trinity River Action Coalition, and (13) Concerned Citizens of Cadillac Heights.

**3.** A section titled "Abstract" of the 1987 REIS states:

> Numerous unrelated development projects are currently being proposed along the Trinity River and its tributaries in Dallas, Denton, and Tarrant Counties, Texas. Most involve modification of the river channel and/or floodplain in one form or another and may require U.S. Army Corps of Engineers permits. Because, individually or cumulatively, these projects have the potential to compromise existing flood protection and because of competing public demands

for other uses of the river channel and flood plain, it was necessary to develop a regional perspective in order to properly evaluate the impacts of individual permit decisions in accordance with the spirit and intent of the National Environmental Policy Act (NEPA) and other applicable laws. This study identifies a widespread lack of Standard Project Flood protection under a variety of hypothetical future scenarios. Flood damages and fiscal impacts for each scenario are predicted, as well as differential impacts on wildlife habitat, water quality, cultural resources, and other regional parameters such as transportation, recreation, and solid waste disposal. Based on the study findings and public input, the U.S. Army Corps of Engineers will develop a regional strategy for the implementation of its regulatory program. This study will be documented and displayed in a public Record of Decision.

(HCAR at 2615.)

Following significant flood events in 1989 and 1990, the City of Dallas requested reactivation of the authorized DFE project. (Defs.' Mem. at 2; Pls.' Br. at 2.) As a result, the project was reactivated in 1990, provided that it would be reevaluated prior to construction. (Defs.' Mem. at 2.) During the early stages of the reevaluation effort in the 1990s, the COE determined that the original 1965 DFE project was no longer economically justifiable because there "was not enough flood damage benefits in the DFE study area to justify either the cost of the original project, or the cost of any other alternative considered." [4] (Pls.' Amend. Compl. ("Pls.' Compl.") at 20, 30; Pls.' Br. at 2; Defs.' Amend. Answer ("Defs.' Answer") at 10, 16.)

The authorization for the construction of the DFE project was modified by the 1996 Water Resources Development Act (P.L. 104–303) [5] and by the Water Resources Development Act of 1999 (P.L. 106–53). [6] (Defs.' Mem. at 2.) In addition, the COE developed new computer models for the Upper Trinity River that computed flood levels at several feet higher than those computed by earlier computer models used in the 1987 REIS. [7] (Pls.' Br. at 2; Defs.' Answer at 20.) "As a result of this newly computed flood level being so much higher than previous calculations, the existing Dallas Floodway Levee System ("Dallas Floodway") [8] would now be overtopped, resulting in flooding of downtown Dallas." (Pls.' Br. at 2; see Pls.' Compl. at 20; Defs.' Answer at 11.) According to Plain-

---

**4.** Plaintiffs assert that the DFE project was found to lack economic feasibility based on the old computer models used in the 1987 REIS. Plaintiffs allege that the COE's use of improperly calibrated new computer models manufactured, in essence, a seven-foot increase in the Standard Project Flood in order to make the DFE project economically feasible. Defendants claim that only the originally authorized 1965 DFE project was found to be economically unfeasible based on the COE's new computer modeling. Defendants assert that the current DFE project, known as the LLP or the recommended plan, is a completely different plan and the difference in the level of the flood elevations is based on changes that have taken place that are detailed in the 1999 EIS.

**5.** Section 351 of the Water Resources Development Act of 1996, Pub.L. No. 104–303, states:

DALLAS FLOODWAY EXTENSION, DALLAS, TEXAS.
(a) IN GENERAL.—The project for flood control, Dallas Floodway Extension, Dallas, Texas, authorized by section 301 of the River and Harbor Act of 1965 (79 Stat. 1091), is modified to provide that flood protection works constructed by the non-Federal interests along the Trinity River in Dallas, Texas, for Rochester Park and the Central Wastewater Treatment Plant shall be included as

a part of the project and the cost of such works shall be credited against the non-Federal share of project costs.

**6.** Section 356 of the Water Resources Development Act of 1999, Pub.L. No. 106–53, states:

DALLAS FLOODWAY EXTENSION, DALLAS, TEXAS.
The project for flood control, Dallas Floodway Extension, Dallas, Texas, authorized by section 301 of the River and Harbor Act of 1965 (79 Stat. 1091) and modified by section 351 of the Water Resources Development Act of 1996 (110 Stat. 3724), is further modified to add environmental restoration and recreation as project purposes.

**7.** Plaintiffs allege that the substantial increase was due to a manipulation of the computer models. (Pls.' Compl. at 30–32.) Defendants claim that the increase was due to the use of more accurate hydrologic information and topographic maps that were obtained as a result of the flood events in 1989 and 1990. (Defs.' Answer at 10–11.)

**8.** At the present time, the Trinity River through Dallas is bounded by a levee system, called the Dallas Floodway Levee System. This levee system protects downtown Dallas, among other areas. (Pls.' Br. in Supp. of Mot. for Summ. J. at 1.)

tiffs, "[t]his was an alarming development because previous Corps' studies as late as 1987 had found the existing Dallas Floodway system to be more than adequate to protect downtown Dallas from flooding during even the most severe of flood events, the Standard Project Flood ("SPF")." [9] (Pls.' Br. at 3.)

Between 1991 and 1998, the COE evaluated several alternatives to the DFE project.[10] (Defs.' Mem. at 3.) In a resolution dated August 28, 1996, the City of Dallas selected a locally preferred plan ("LPP"), known as "The Chain of Wetlands Plan," [11] for the project and also approved the construction of SPF two-foot levees to protect the Lamar Street and Cadillac Heights areas. (HCAR at 4.) This combination plan became known as "The Chain of Wetlands Plus Levees Plan" and was adopted by the City of Dallas as the final LPP, by a resolution dated March 26, 1997. (HCAR at 117.) Recreational features were later also incorporated into the Plan. (Defs.' Mem. at 3; HCAR at 102, 121.)

The final LPP was eventually adopted as the Federally Supportable Plan. (Defs.' Mem. at 4.) In 1998, the COE released a Draft General Reevaluation Report and Integrated Environmental Impact Statement for public review and comment. (HCAR 1505–2614.) After this review and comment, the District Engineer for the Fort Worth District approved a Final General Reevaluation Report and Integrated Environmental Impact Statement for the DFE project ("1999 EIS"). (Defs.' Mem. at 4; HCAR 1–1504.) On December, 1, 1999, Major General Hans A. Van Winkle signed a Record of Decision ("1999 ROD"), finding the 1999 EIS "for the DFE suitable to use as a plan for implementation of flood damage reduction, environmental restoration and recreation at Dallas, Texas." (Defs.' Mem. at 4.) The purpose of the DFE project is to extend flood protection southward and eastward (downstream) from the end of the Dallas Floodway, which is the levee system that bounds the Trinity River and currently protects downtown Dallas, to Five Mile Creek.[12] (Pls.' Br. at 1; HCAR at 16253.)

9. The SPF is "defined as the flood that may be expected from the most severe combination of meteorological and hydrologic conditions that are considered to be reasonably characteristic of the geographical region involved, excluding extremely rare combinations." (HCAR at 242.)

10. Plaintiffs allege that the DFE project is just one part of a much larger master plan for the Trinity River, known as "The City of Dallas Trinity River Corridor Project." Plaintiffs claim that the Trinity River Corridor Project is made up of the following projects: (1) DFE project, (2) the Chain of Lakes, (3) Transportation Improvements, including the Trinity Parkway and Woodall Rogers Bridge, (4) the Elm Fork levee, and (5) the Great Trinity Forest. (Pls.' Amend. Compl. at 21–22.)

11. The Chain of Wetlands Plan consists of constructing a new 400–600 foot wide swale or channel of wetlands parallel to and west of the existing Trinity River. This channel will extend from the Cadillac Heights area to the Loop 12 bridge, with a break at the I–45 bridge (where the existing river channel will be realigned.) The purpose of this new swale is to accommodate increased flows, to lower flood levels caused by the new levees, and to lower flood levels upstream. (Pls.' Amend. Compl. at 19.) Defendants deny that the purpose of the swale is to lower flood levels caused by the proposed new levees. (Defs.' Answer at 10.)

12. "The project study area extended along the Trinity River from the end of the existing Dallas Floodway to the north and extending southwest to the confluence of Five Mile Creek, a distance of approximately 9.5 miles." (HCAR at 3.) "[D]ue to changes in the floodplain and the backwater effects on the downstream end of the Dallas Floodway Levees, the risk of overtopping of these levees has become a major consideration." (HCAR at 33.) Consequently, the Dallas Floodway was included in the DFE project study area.

Plaintiffs, in their complaint, assert that the 1999 EIS violated the APA and NEPA in four ways: (1) the COE violated the APA through improper manipulation of computer model estimates of flood levels along the Trinity River that raised the elevation of the SPF as much as seven feet higher than previous model estimates; (2) the COE violated the NEPA by failing to fully disclose certain environmental impacts and economic benefits of the DFE project and failing to discuss alternatives to the DFE project; (3) the COE violated the NEPA by failing to consider "connected actions" under 40 C.F.R. § 1508.25 and "cumulative impacts" under 40 C.F.R. § 1508.7; and (4) the COE violated the APA by failing to follow its own 1988 ROD.[13] (Pls.' Compl. at 2–4.)

## II. STANDARDS OF REVIEW

### A. Summary Judgment Standard

■ In the usual case, summary judgment is proper when the record, viewed in the light most favorable to the non-moving party, establishes that no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Hill v. London, Stetelman, & Kirkwood, Inc.*, 906 F.2d 204, 207 (5th Cir.1990); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "However, in a case such as this, where the Court is reviewing the decision of an administrative agency, a motion for summary judgment 'stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review.'" *Piedmont Envtl. Council v. United States Dep't of Transp.*, 159 F.Supp.2d 260, 268 (W.D.Va.2001) (cit-

ing *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D.Va.1994)). As a result, the movant's burden in proving his motion for summary judgment is similar to his ultimate burden on the merits. *See Piedmont Envtl. Council*, 159 F.Supp.2d at 268.

■ "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record ..., even though the Court does not employ the standard of review set forth in Rule 56." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995). "In reviewing administrative agency decisions, the function of the district court is to determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did, and summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did." *The Sierra Club v. Dombeck*, 161 F.Supp.2d 1052, 1064 (D.Ariz.2001); *see City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir.1997).

### B. APA Standard

■ Section § 702 of the APA provides a way for persons "suffering legal wrong because of agency action,[14] or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to obtain judicial review of that action. 5 U.S.C.A. § 702 (West 1996). Section 706 of the APA, which sets out the scope of judicial review, states:

To the extent necessary to decision and when presented, the reviewing court

---

**13.** The Court notes that Plaintiffs' complaint originally contained five counts. The parties agreed to dismiss count 5.

**14.** "The COE is a federal agency whose actions may be reviewed under § 702 of the APA." *Hoosier Envtl. Council, Inc. v. Army Corps of Engineers*, 105 F.Supp.2d. 953, 965 (S.D.Ind.2000).

shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

5 U.S.C.A. § 706 (West 1996). "To determine whether agency action was arbitrary or capricious, a court must consider 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Dombeck*, 161 F.Supp.2d at 1064 (*citing Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).[15] The burden of proving that an agency decision was arbitrary or capricious generally rests with the party seeking to overturn the agency decision. *See Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995) (stating that the party challenging agency action under the APA bears the burden of proof); *North Carolina Alliance for Transp. Reform v. United States Dep't of Transp.*, 151 F.Supp.2d 661, 679 (M.D.N.C.2001).

 In making its determinations, the Court must "review the whole record or those parts of it cited by a party." *Id.* Although the Court is to carefully review the facts, the Court is not allowed to substitute its judgment for that of the agency.

*See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). If the decision reached by the agency " 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by statute, we should not disturb it unless it appears that the accommodation is not one that Congress would have sanctioned.'" *Chevron U.S.A. v. Natural Res. Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (*quoting United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)). In applying this standard, courts generally look at " 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body.'" *Mobil Oil v. Dep't of Energy*, 610 F.2d 796, 801 (Em.App.1979) (*quoting Texaco, Inc. v. FEA*, 531 F.2d 1071, 1076–77 (Em.App.1976)); *see Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. The Court may not "lightly set aside agency action based on the exercise of [the agency's] accumulated expertise merely because, were [it] trying the matter anew, [it] might reach a different result." *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1142 (9th Cir.1978); *see Chevron*, 467 U.S. at 844 n. 14, 104 S.Ct. 2778 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construc-

**15.** In *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Supreme Court offered several examples of circumstances in which an agency action "normally" would be considered arbitrary and capricious: situations where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See also Puerto Rico Sun Oil Co. v. U.S. EPA*, 8 F.3d 73, 77 (1st Cir.1993).

tion, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding"). Under this "exceedingly deferential" standard, the Court may not substitute its judgment for that of the agency, but may only set aside the Corps' decision for "substantial procedural or substantive reasons as mandated by statute." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541–42 (11th Cir.1996).

## C. *NEPA Standard*

 The underlying purpose behind NEPA is to establish a national policy in favor of protecting and promoting environmental quality. *See* 42 U.S.C. §§ 4321, 4331(a) (West 1994); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir.1996). In order to achieve this policy, NEPA requires federal agencies to follow certain procedures set out in the statute before and during the undertaking of any project that affects the environment. *See Glickman*, 81 F.3d at 443 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs"). By forcing agencies to evaluate the environmental consequences of any proposed action, the NEPA is able to achieve its substantive goals. *See Robert-*

*son v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

 Because NEPA does not contain judicial-review provisions, compliance with NEPA is reviewed under the APA. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988); *Life of the Land v. Brinegar*, 485 F.2d 460, 469 (9th Cir.1973) (indicating that action by an agency under NEPA is subject to judicial review under 5 U.S.C. § 706(2)(A) of the APA). Consequently, an agency's EIS may only be reversed or remanded if it is arbitrary, capricious, or an abuse of discretion.[16] *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This requires the court to ensure that the agency took a "hard look" at the environmental consequences of its actions. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993). It is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835; *Mor-*

---

**16.** "The federal judiciary's responsibility to review an agency's decisions generally does not extend to finding facts and drawing conclusions that would infringe on the authority Congress delegated to the agency to make independent decisions in its area of expertise. Instead, for a court in an environmental case, the expression 'Let's look at the record' means that judicial attention is focused on the agency's compliance with NEPA's procedure-forcing steps in an effort to ensure that environmental concerns are fully considered." *Nat'l Audubon Soc'y*, 132 F.3d 7, 10 (2d Cir. 1997).

There are two standards that govern the review of an agency's actions under NEPA. "Factual disputes, which implicate substantial agency expertise, are reviewed under the arbitrary and capricious standard of § 706(2)(A) of the Administrative Procedure Act." *Surfrider Found. v. Dalton*, 989 F.Supp. 1309, 1318 (S.D.Cal.1998); *see Marsh*, 490 U.S. at 376–77, 109 S.Ct. 1851. "Legal disputes are reviewed under the reasonableness standard." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir.1995) (noting that "[c]hallenges to agency actions which raise predominately legal, rather than technical questions, are rare").

*ongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 575 (9th Cir.1998).

 NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the human environment." 42 U.S.C.A. § 4332(2)(C) (West 1994). The purpose for the EIS is "to provide decision makers with sufficiently detailed information to aid in determining whether to proceed with the action in light of the environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Northwest Res. Info. Center, Inc. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1064 (9th Cir.1995); *see Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 814 (9th Cir.1987), *rev'd on other grounds,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "This detailed statement 'insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug' and serves as an 'environmental full disclosure so that the public can weigh a project's benefits against its environmental costs.'" *National Audubon Soc'y v. Hoffman,* 132 F.3d 7, 12 (2d Cir.1997) (quoting *Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1049 (2d Cir. 1985)).

 NEPA specifies five specific issues that must be addressed in the EIS: (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. *See* 42 U.S.C.A. § 4332(2)(C) (West 1994). The Fifth Circuit "has set forth three criteria for determining the adequacy of an EIS: (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action." *Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir.2000); *see Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Eng'rs,* 646 F.2d 215, 220 (5th Cir.1981). The information satisfying these three criteria must be in the EIS and the conclusions upon which the EIS is based must be supported by the evidence in the administrative record. *Mississippi River Basin Alliance,* 230 F.3d at 174–75. "Because the 'analysis of the relevant documents requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies.'" *Mississippi River Basin Alliance,* 230 F.3d at 175 (quoting *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851). The Court should not second guess the experts if the EIS is a good-faith, objective, and reasonable presentation of the subject areas mandated by NEPA. *See Manygoats v. Kleppe,* 558 F.2d 556, 560 (10th Cir. 1977). Plaintiffs bear the burden of showing by a preponderance of the evidence that Defendants have failed to adhere to the requirements of NEPA. *See Sierra Club v. Morton,* 510 F.2d 813, 818 (5th Cir.1975); *Sierra Club v. Callaway,* 499 F.2d 982, 992 (5th Cir.1974).

### III. DISCUSSION

**A. Count 1: Violation of § 706(2)(A) of the APA Through Improper Manipulation of Computer Model Estimates of Flood Levels**

With respect to count 1, Plaintiffs state: [T]he decision by Major General Hans Van Winkle to recommend implementation of the DFE project was arbitrary, capricious, an abuse of discretion and constitutes bad faith in violation of the APA because the hydrologic and hydraulic models underlying this analysis were manipulated by the Corps' Fort Worth District to produce false flood elevations, thereby creating economic benefits for the DFE project that would not and do not exist.

(Pls.' Mot. for Summ. J. at 8.) Plaintiffs assert that the 1987 REIS produced by the COE utilized updated computer models that reflected "September 1986 conditions of urbanization in the watershed and established flood elevations for both the 100–year and SPF flood events" and concluded that the Dallas Floodway was adequate to control flooding. (Pls.' Br. at 8–9.) Plaintiffs further allege that the COE, in the 1988 ROD, established a review process that was to be used to evaluate any potential action that was to occur in the Trinity River corridor. (*Id.* at 9.) As part of this process, the 1988 ROD established the following criteria:

[T]here would be no increase allowed in the level of the 100–year and SPF floods from the baseline established in the

[1987 R]EIS, that the maximum allowable loss in storage capacity of the 100–year and SPF discharges would be 0% and 5% respectively, that erosive water velocities could not be created or increased and that the flood plain could be altered only to the extent it is done equally.

(Pls.' Br. at 9.)

Plaintiffs allege that when the COE performed its hydrologic and hydraulic analysis in the 1990s with respect to the DFE project, the new models indicated that the SPF levels were projected to rise to a higher elevation than the Dallas Floodway levees, leading to an overtopping of the levees and flooding in downtown Dallas. (Pls.' Br. at 9.) Plaintiffs assert that the new computer models were manipulated to raise the flood elevation for the SPF seven feet higher than the flood elevation found by the computer models used in the 1980s. As a result of this seven-foot increase, the DFE project suddenly became economically feasible.[17] (*Id.*) In other words, Plaintiffs assert that Defendants, in essence, "manufactured" the seven-foot increase in the projected flood elevations in order to justify the construction of the DFE project. Specifically, Plaintiffs allege that the new computer models were manipulated in four ways: (1) the hydrologic (HEC–1) and hydraulic (HEC–2) computer models were improperly calibrated because the 1999 EIS shows the calibration results for flow to only *one* gauge and the establishment of flood elevation to the *second* gauge, where-

---

17. Defendants claim that Plaintiffs have misinterpreted their answer to Plaintiffs' Amended Complaint in which Defendants admit that their reevaluation of the project in 1990 determined that there was not enough flood-damage-reduction benefits in the DFE study area to justify the cost of the original 1965 project or the cost of any other alternatives considered with the 1965 project. In other words, Defendants claim that Plaintiffs are incorrectly asserting that the DFE project was determined to be economically infeasible based on computer models used in previous COE studies. Defendants assert that the determination that the original 1965 DFE project was no longer economically feasible was based on the COE's new computer modeling. (Defs.' Mem. in Opp'n to Pls.' Cross Mot. for Summ. J. at 3–4.)

as Plaintiffs contend that both flow and elevation results must be computed to past events at *both* gauges to properly calibrate the models (Defs.' Mem. at 7.); (2) as a result of the improper calibration, the flows utilized by the COE for analyzing and justifying the DFE project were overstated by 30%, which led to an overestimation of flood elevation levels by about two feet; (3) the COE did not follow the instructions in the user guide for the HEC–2 computer model and impermissibly allowed flow in areas where the user guide states that flow should not be allowed, which artificially increased the flood elevation by about two feet; and (4) the COE manipulated the hydrologic and the hydraulic computer models to prevent any floodwaters from leaving the Dallas Floodway by way of overtopping the levees, which resulted in higher flood levels being computed than would really occur. In addition, Plaintiffs complain that the COE's failure to include any discussion in the 1999 EIS about the seven-foot increase in the SPF flood elevations from those contained in the 1987 REIS also violates the APA. (Pls. Br. at 21–22.)

■ With respect to the first four allegations of manipulation, the parties, in their cross motions for summary judgment, responses, and replies, engage in an extremely technical and wordy battle over whether the COE did, in fact, properly calibrate their computer models in order to achieve accurate results with respect to the feasibility of the DFE project. The record before the Court indicates that there is a factual disagreement among the parties regarding whether the computer models were properly calibrated. On judicial review, the role of the Court is not to attempt to become a tie-breaking technical expert. The Court cannot designate itself as a computer-calibration expert. *See Druid Hills Civic Ass'n, Inc. v. Federal Highway Admin.*, 772 F.2d 700, 711 (11th Cir.1985); *see also Movement Against De-*

*struction v. Trainor*, 400 F.Supp. 533, 552–556 (D.Md.1975). "Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Oregon Natural Res.*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (*citing Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *see Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential")).

■ Instead, the role of this Court is to determine whether Defendants' implementation of their methodology had a rational basis that was consistently applied. *See Druid Hills Civic Ass'n*, 772 F.2d at 711. After reviewing the record, the Court concludes that Plaintiffs have failed to show that Defendants' calibration of the computer models was arbitrary and capricious. *See Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814; *Marita*, 46 F.3d at 619; *see also* 40 C.F.R. §§ 1052.8, 1500.4(d), 1502.1, 1502.2(a) & (c) (stating that an EIS must be concise, clear, and to the point and written in plain language so that the public can easily understand it); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir.1975) (stating that reasonable forecasting and speculation is implicit in NEPA); *Valley Citizens for a Safe Env't v. Aldridge*, 969 F.2d 1315, 1318 (1st Cir.1992) (stating that "the place to attack standard methodology, at least in the first instance, is before the agency, not before a reviewing court") (*citing Valley Citizens for a Safe Envt. v. Aldridge*, 886 F.2d 458, 469 (1st Cir.1989)).

With respect to the COE's failure to include any discussion in the 1999 EIS about the seven-foot increase in the SPF flood elevations from those contained in

the 1987 REIS, the Court is not aware of any requirement imposed by the APA or, for that matter, NEPA, that would call for such a discussion. As stated above, NEPA requires a federal agency to prepare a detailed statement on the environmental impact of any proposed action that affects the environment. *See* 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.2(g). The Court agrees with Defendants that the seven-foot increase in the elevations of the SPF was not the result or consequence of a proposed federal action. *See* Defs.' Mem. at 23–24.

With respect to the computer models and any increase in the flood elevations, the 1999 EIS states:

> The SPF flood elevations used to establish the original design grade of the [Dallas Floodway] levees were computed using hand backwater calculations. Subsequent studies, using an LRD–1 hydraulic model, confirmed the original SPF flood elevations. The HEC–2 hydraulic model compiled for this study, updated for current conditions, computes higher water surfaces downstream of the Dallas Floodway than those computed with the earlier model.

(HCAR at 33.) In addition, page A–10 of the 1999 EIS states:

> Examination of historical aerial photographs revealed that a gradual increase in the density of the vegetative cover on the floodplain has occurred and increased the hydraulic roughness of the floodplain over time. This has resulted in the computation of higher flood levels within the study reach than in previous studies. Several landfills placed within the floodplain in the study reach have also raised flood levels due to the reduction of flow conveyance area and the reduction of available valley storage of floodwater.

(HCAR at 242–43.) On page 3–2 of the 1999 EIS, the COE stated:

> Continued urbanization throughout the watershed is a significant factor influencing both the current and future flood problems. Various Federal and non-Federal flood control projects have been constructed to alleviate the flooding problems . . . .
>
> . . . . .
>
> Channel capacities of the Trinity River within the study area are inadequate to confine events beyond the 2–year frequency. Increased urbanization in the upper watershed area and increased vegetation growth in the primary area of concern has intensified the flooding problem.
>
> . . . . .
>
> In order to accurately assess the need for flood damage reduction measures, an analysis of annual damages under existing conditions was performed. Due to the complexity and length of this study, the existing conditions[,] hydrology, hydraulic, and economics models used in the initial investigation phase (1991–1993) were modified to reflect more recent topographic data, and changes in design and economic parameters.

(HCAR at 53.) In addition, a section in the 1999 EIS detailing general information on the Hydraulic Models states:

> The PC version 4.6 of the HEC–2 Water Surface Profiles computer program was used to hydraulically model and compute water surface profiles for this study. Several HEC–2 backwater models with differing input data sets have been used for this study. Initially HEC–2 models were produced using cross-sections obtained from the City of Dallas topographic maps developed in 1997 and was· the most recent topographic information available at the time the model was prepared. When the topographic mapping used for the Upper Trinity River Feasibility Study became available later in the study, the decision

was made to update the models with the more recent topographic data. Therefore, models for this study would be consistent with the HEC–2 models used for the Upper Trinity Feasibility Studies.

The City of Dallas topographic maps used for the "existing conditions" HEC–2 models developed initially were updated as much as possible to represent current conditions. The City of Dallas topographic maps were compiled from aerial photography flown in March 1977, and have a contour interval of two feet and a scale of one inch equals two hundred feet. Cross-sections for the model were taken directly from the topographic maps on average every 1,000 feet of river distance. Channel geometry was input from surveyed cross-sections used in previous Trinity River LRD–1 hydraulic models. The 1977 topographic maps were updated to reflect the contours of two City of Dallas landfills located in the floodplain of the Trinity River that were completed after 1977 and was reflected in the City of Dallas Topographic maps. Information relating to current conditions for the McCommas Bluff Landfill located near I.H. 20 was not available to update the 1977 topography. [A] calibration of this model was accomplished by the methods described under "Calibration Model" to closely match the May 1990 Flood. This model was used for initial plan formulation and the initial determination of the National Economic Development (N.E.D.) Plan.

In 1994, the existing conditions model discussed above was abandoned and a new model was created which was based on mapping made available as a result of the concurrent Upper Trinity Feasibility Study. Basic input data for the current model was obtained from cross-sections taken from digitized topographic mapping produced by photogrammetry.

The cross-sections were taken electronically from the digitized mapping data rather than from topographic maps and contain ground points having elevations mapped to one tenth of one foot. The cross-section locations are identical to those used in the initial HEC–2 models. The mapping was compiled from aerial photography flown in February 1991. The mapping complies with National Map Accuracy Standards and has a vertical accuracy of plus or minus 0.5 ft.

The following description applies to the development of HEC–2 models derived from both sets of topographic data described above. Four highway bridges and three railroad bridges were modeled by the HEC–2 Normal Bridge method using the best available as-built bridge plans. The I–45 bridge was not modeled in the normal manner because of several factors. First, the bridge crosses the entire floodplain with no contraction of flows caused by the bridge abutments. Secondly, the bridge crosses the floodplain on an extreme skew making it impractical to model by usual methods. Thirdly, the low steel of the bridge is sufficiently high that it would not influence the highest flood flow that would be analyzed. Therefore, the pier losses were accounted for by the use of the Manning's roughness coefficient in each successive cross-section. Due to the broad and varied nature of the floodplain, "NH" records were used in the models to vary the Manning's roughness coefficients horizontally, to more accurately model the floodplain roughness.

The White Rock Creek confluence to the Trinity River and the low lying residential areas north of the Rochester Park Levee store significant volumes of flood water during major flood events. This created a need to compile separate HEC–2 models to calculate flood volumes. One model was used to compute water surface profiles by representing

only conveyance areas of the floodplain. Another was used to compute storage volumes for the various floods under consideration so that peak discharges would be more accurately computed. This was done for both the initial HEC–2 model and the current one. The stage-discharge relationship of the conveyance model was retained during computation of the storage volumes by use of rating curve input to the model cross-sections.

**Calibration Model**

A recent major flood event occurring in May 1990 provided a reasonable basis for calibrating the HEC–2 backwater models because the flood was estimated to be the highest magnitude since 1942 and high watermarks were established for the study reach following the flood. When the Upper Trinity Feasibility Study topographic data became available, development of a common HEC–2 model to be used for each of the two concurrent studies was needed. Therefore, another model calibration was needed to establish the hydraulic roughness values in the floodplain consistent with the new topographic date. The 1991 topographic data represented hydraulic conditions at the time of the May 1990 flood sufficiently to be used without revision for the calibration.

(HCAR at 245–246; *see* HCAR at 247–48.) In addition, there are aerial photos from various years in the administrative record that support the COE's statements in the 1999 EIS that vegetation and other land characteristics have changed; thus, causing the flood elevations to potentially increase. (*See* HCAR at 14546, 14545, 14122–14130, 14142–14150 and 13872–13878).[18]

Based on the above-quoted passages and the evidence in the EIS detailing the computer models, *see, e.g.*, HCAR at 186–90, the Court is convinced that the COE adequately disclosed the reasons for any increase in the flood elevations. This disclosure reflects that the COE satisfied the goals of the APA and of NEPA by taking a "hard look" at the environmental consequences of the DFE project and providing the public with enough information to participate in the process. *See Envtl. Defense Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 492 F.2d 1123, 1136 (5th Cir.1974) (stating "it is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action[;]" rather "[t]he detail required is that sufficient to enable those who did not have a part in [the EIS's] compilation to understand and consider meaningfully the factors involved"). Therefore, Defendants are entitled to summary judgment on count 1.

B. *Count 2: Violation of NEPA by Failing to Fully Disclose Environmental Impacts and Discuss Alternatives*

With respect to count 2, Plaintiffs assert that Defendants violated NEPA by failing to fully disclose three things: (1) the cumulative impacts of the DFE project and past actions on water surface elevations, (2) the flooding resulting from overtopping of the existing levees, and (3) alternative courses of action for reducing the flooding.

1. *Past Cumulative Impacts* [19]

■ Plaintiffs allege that the 1999 EIS violates NEPA because it fails to address

---

**18.** The Court notes that these ariel photographs are of very poor quality. Nevertheless, the Court is able to see that significant changes have occurred, as would be expected, over the years from 1951 through 1992.

**19.** The Court notes that the issue of past cumulative impacts and disclosure of the seven-

the cumulative impact of the DFE project and past actions on water surface elevations. Specifically, Plaintiffs argue that the seven-foot rise in the SPF flood levels was not fully discussed or disclosed as a cumulative impact in the 1999 EIS, as required under NEPA. (Br. in Support of Pls.' Obj. and Resp. To Def.' Cross Mot. for Summ. J. ("Pls.Resp.") at 11.) Plaintiffs claim that NEPA, the 1987 REIS, and the 1988 ROD required Defendants to discuss the seven-foot increase.[20] (Pls. Br. at 24, Pls. Resp. at 13). Plaintiffs assert that Defendant's failure to include a discussion of the seven-foot increase in the SPF from the 1987 REIS to the 1999 EIS is not full disclosure and is an attempt to conceal the fact that the COE has "manipulated" the increase. (Pls.' Resp. at 10–14.)

A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (2000). "Actions" are defined as follows:

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policy's, or procedures; and legislative proposals (§§ 1506.8, 1508.17). . . .

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act . . .; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as

foot increase under NEPA in this section is very similar to the issue involved in count 1 of whether the APA or a broad, general reading of NEPA (without reference to any particular section) requires the seven-foot increase to be discussed in the 1999 EIS. In count 1, the Court found that neither the APA, nor a broad, general reading of NEPA, required an explicit disclosure of the seven-foot increase in the SPF flood elevations from the computer models used in the 1987 REIS to the computer models used in the 1999 EIS, beyond that which was already contained in the 1999 EIS. The Court, in count 1, found that the evidence in the record did adequately disclose the reasons for the increase. In this section, Plaintiffs are arguing that the seven-foot increase

was required to be disclosed under NEPA under a specific section, the "cumulative impacts" section. Plaintiffs, in this count are alleging, in essence, that the seven-foot increase is the result of the cumulative impact of the DFE project and the seven-foot increase and, thus, was required under a specific section of NEPA, 40 C.F.R. § 1508.7, to be disclosed. The Court is analyzing this count separately, even though the analysis is essentially the same as in count 1, due to Plaintiffs' focus on a specific section of NEPA.

20. The 1987 REIS and the 1988 ROD and their effects or implications on the DFE project will be discussed in more detail in count four, *infra*.

well as federal and federally assisted activities.

40 C.F.R. § 1508.18 (2000).

Defendants argue that they are not required by NEPA to discuss the seven-foot rise in the SPF in the 1999 EIS because it was not due to or caused by the DFE project or the consequence of a past federal action. (Defs.' Br. at 24–26; Defs.' Mem. in Opp'n to Pls.' Response ("Defs.' Resp.") at 5–6.). The Court agrees. As discussed above in section III.A., the 1999 EIS adequately explains the data used in the computer models that resulted in the flood elevation levels used in the study. In addition, the 1999 EIS contains a discussion of the 1987 REIS and the 1988 ROD. (*See* HCAR at 186–87.) [21] The seven-foot rise in the SPF from the 1987 REIS to the 1999 EIS was not an environmental consequence or impact of the DFE project itself

or a federal "action," but was instead the result of changing conditions and improved data. Consequently, NEPA did not require that it be discussed in the 1999 EIS as a cumulative impact. Thus, the Court concludes that it was not arbitrary and capricious for the COE to omit an explicit discussion concerning the seven-foot increase, beyond that already contained in the 1999 EIS, and Defendants are entitled to summary judgment on this issue.

### 2. Flooding Resulting from Overtopping the Levees

▉ Plaintiffs allege that the 1999 EIS fails to show exactly where the potential flooding of downtown Dallas would occur if the DFE project was not implemented [22] and fails to clearly state that the majority of the DFE project benefits are to downtown Dallas.[23] (Pls.' Br. at 28.) Defen-

---

21. Specifically, the 1999 EIS states:

The Corps of Engineers completed an Environmental Impact Statement and a Record of Decision (ROD) in 1988 that addressed the cumulative impacts of a number of unrelated independent proposed actions within the Upper Trinity River Basin. The authority for the study was based upon the Corps regulatory requirements. The results of the EIS gave strong indications that there are potential cumulative impacts associated with individual floodplain developments that are both measurable and significant. Public comment and discussion focused on the undesirability of additional regional increases in flood hazards for either the 100–year or Standard Project Flood and that floodplain management should stabilize the flood hazard at existing levels through regulation and efforts of both the Corps and local organizations. The ROD provided a framework of criteria that would become the basis for the Regulatory Program within the Regional EIS study area. The Regulatory Program includes those actions proposed by the Corps of Engineers that are subject to Section 404, section 9 or 10 compliance.
(HCAR at 186–87.)

22. Plaintiffs state:

[T]here essentially is no discussion or description of the area that would be flooded

within Reaches 7 and 8. Nowhere in the [1999 EIS] can a map be viewed that shows the spatial area that would be flooded by the overtopping of the levees. Nowhere in the [1999 EIS] are the buildings that would be flooded shown. Nowhere in the [1999 EIS] is there any disclosure of how deep the water gets into these buildings into downtown Dallas. Are they flooded by one inch of water, one foot of water, or twenty feet of water? That information is simply not in the [1999 EIS].
(Pls.' Br. at 29 (citations omitted)).

23. Plaintiffs state:

The disclosure in the [1999 EIS] is essentially limited to the DFE study area downstream of the existing levee although the economic benefits are not so limited. That DFE study area is defined on page 2–2 and is shown on Figure 2–3 in the [1999 EIS]. Figure 2–5 is a beautiful color map of the vegetation in the DFE study area. The entire existing conditions discussion in Chapter 3 of the [1999 EIS] is related to this study area. In Figure 3–1, the economic reach map is presented. This is the only map in the entire [1999 EIS] that shows even a portion of the area where most of the economic benefits occur. Reach 7 and

dants claim that they were not required to detail the environmental flooding impacts on downtown Dallas because these are not impacts that would result from the project; instead, these are impacts that would occur if the DFE project were *not* constructed. (Defs.' Mem. at 27.) In addition, Defendants assert that they did clearly indicate in the 1999 EIS that the majority of the economic benefits from the DFE project were obtained outside the boundaries of the project. (Defs.' Resp. at 17.)

> Reach 8, the areas that make up 55% or more of the economic benefits of the DFE project, are barely shown at the northern periphery of Fig. 3–1. The only place Plaintiffs have found any information on the spatial extent of Reach 7 is found in one sentence on p. 3–7 stating that Reach 7 encompasses the SPF floodplain behind the East Levee. However, it is impossible for a member of the public to get that information from Figure A–38 (in which the SPF floodplain is not shown behind the existing levees), or from any discussion in the main text of the [1999 EIS]. In fact, the Corps admitted that in the [1999 EIS], the spatial extent of this downtown Dallas flood damage is never described or discussed. That is not full disclosure. That is misleading.
> (Pls.' Br. at 28–29 (citations omitted)).

**24.** *See* 40 C.F.R. § 1502.14 and the detailed discussion of alternatives in section III.B.3, *infra*.

**25.** Plaintiffs claim that the facts in this case are similar to the facts in *Sierra Club v. Sigler*, 695 F.2d 957, 975 (5th Cir.1983). In *Sigler*, the plaintiffs brought suit challenging the issuance by the COE of several permits authorizing private construction of a multipurpose deepwater port and crude oil distribution system in Galveston Bay, which is part of a system of estuarine bays along the Texas coast and serves as a nursery and habitat for a large number of wildlife. The plaintiffs argued that the EIS violated NEPA because it relied on the benefits of bulk cargo activities that would result from the construction of the port and crude oil distribution system without evaluating the adverse effects of these activities. The Fifth Circuit held that "once the Corps chose to trumpet the benefits of bulk cargo activities in the EIS as a 'selling point'

With respect to the claim that the EIS did not fully disclose the extent of flooding in downtown Dallas and the associated costs, the Court agrees with Defendants that such flooding would occur only if the DFE project were not constructed. The COE, in compliance with NEPA, did consider the alternative of "no action" [24] by considering the impacts that would result if the DFE project were *not* constructed.[25] The COE then determined that the alternative of "no action" was not the best course of action.[26] (*See, e.g.,* HCAR at

for the oil project, it rendered a decision that these activities were imminent." Therefore, NEPA required that the Corps also fully disclose the costs of the bulk-cargo activities.

This case is distinguishable from *Sigler*. One of the benefits of the DFE project is that it will provide additional flood protection to downtown Dallas. The 1999 EIS shows that much of the benefits from the DFE project will be in terms of economic benefits to downtown Dallas as a result of increased flood protection. The costs of increasing this flood protection to downtown Dallas are the costs of constructing the DFE project *itself*, which are shown in the 1999 EIS. The costs of not building the DFE project and, thus, potentially causing more flood damage to downtown Dallas would be the result of "no action" and is not a cost associated specifically with the DFE project. In other words, there are no separate costs, other than the cost of building the DFE project itself, that result from the benefits the DFE project provides to downtown Dallas.

**26.** In a section titled "Initial Screening of Alternatives," the paragraph dealing with the "No Action Plan" states:

> The fundamental alternative to any flood control plan is the no action plan. Adoption of this alternative implies acceptance of the costs and adverse effects of continued flooding. For the city of Dallas, these estimated costs equate to over $6,500,000 annually. In addition, the residents would continue to suffer from the social and economic stresses associated with repetitive flooding and the potential for loss of life. Although citizens with flood insurance would be partially compensated for future

100–02.) Under 40 C.F.R. § 1502.14,[27] once the COE decides to eliminate a reasonable alternative, the COE is only required to *briefly* discuss the reasons for having eliminated such alternative. The 1999 EIS contains such a discussion, and the Court concludes that the COE's analysis of the economic impacts of flooding on downtown Dallas that would result if the DFE project were not constructed was not arbitrary and capricious.

▮ With respect to the claim that the 1999 EIS did not fully disclose the economic benefits to downtown Dallas, the Court notes that the 1999 EIS contains information about these economic benefits in multiple places. On page D–7 of the 1999 EIS, the COE clearly indicates that it was considering a "secondary study area" in its reach determination that included downtown Dallas:

> The study area is located along the Trinity River in the southern sector of the city of Dallas. The initial area of investigation can be defined as that portion of the Trinity River between the confluence of Five Mile Creek, near Interstate–20 (I–20) downstream and the terminus of the existing Dallas Floodway Levee System upstream. However, preliminary analysis revealed significant hydraulic correlations between the extension area and the existing levee system upstream. Specifically, implementation of flood control projects in the extension area significantly influences the performance of the Dallas Floodway Levee System. Subsequently, about

eight miles of the Dallas Floodway Levee System was included in the study area. To facilitate the analysis of *benefits and inducements* in both locations the study area was divided accordingly. The Dallas Floodway Extension is referred to as the Primary Study Area and the Dallas Floodway Levee System as the Secondary Study Area. .

(HCAR at 413–14 (emphasis added); *see* HCAR at 415 (which indicates that downtown Dallas is in Reach 7, which is a part of the Secondary Study Area); HCAR at 33.) In addition, on page 4–1 of the 1999 EIS, the COE indicates that the planning objectives for the 1999 EIS were to include reducing the loss of jobs and wages caused by flooding from the Trinity River within the city of Dallas. (HCAR at 71.) Furthermore, on page 4–2 of the 1999 EIS, the COE explains the economic criteria used for selecting the recommended plan and states that the objective for flood control projects "relates to a plan's capability to prevent flood damages by comparing the plan's economic benefits with the project cost." (HCAR at 72.) In addition, a table on page 4–65 of the 1999 EIS shows that the annual economic benefits to the existing Dallas Floodway, which includes flood protection for downtown Dallas, of the "Chain of Wetlands Both SPF Levees" plan was $ 6,454,578 out of total annual benefits of $11,677,272. (HCAR at 122.)

After reviewing the evidence in the record and noting that the evidence indicates that a large portion of the economic benefits from the DFE project is achieved by

damages, these damages would nonetheless continue to occur and Federal funds would continue to be expended in the flood insurance program and in federal emergency assistance and relief. The no action plan is recommended only when no other solutions are feasible or when environmental damage would be irreparable.
(HCAR at 74; *see also* HCAR at 98, 101, 102)

**27.** The relevant portion states:

This section is the heart of the environmental impact statement. . . . In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

40 C.F.R. § 1502.14 (2000).

the additional flood protection to downtown Dallas, the Court is convinced that the COE's presentation of the information concerning the benefits to downtown Dallas is not arbitrary and capricious. Consequently, the Court concludes that Defendants are entitled to summary judgment on this issue. *See Mason Cty. Medical Ass'n v. Knebel,* 563 F.2d 256, 265 (6th Cir.1977) (stating that "no matter how well the EIS has been written, someone later can always find fault with it").[28]

### 3. *Alternatives*

Section 102(2)(C)(iii) of NEPA requires that an EIS contain a detailed statement of alternatives to the proposed action. The regulations implementing NEPA are promulgated by the Council on Environmental Quality ("CEQ") and contained in the Code of Federal Regulations ("C.F.R.").[29] According to 40 C.F.R. § 1502.14, agencies must explore and evaluate all reasonable alternatives. *See* 40 C.F.R. § 1502.14 (2000).[30] Unfortunately, NEPA does not provide an agency much guidance regarding which alternatives must be considered. "The content and scope of the discussion of alternatives to the proposed action varies with the existing circumstances." *Druid Hills Civic Assn., Inc.,* 772 F.2d at 712.

There are two phases an agency must undergo in analyzing alternatives: "[f]irst, the agency must choose from the universe of options a list of alternatives as "finalists" that it will study in detail[, and s]econd, the agency engages in a more rigorous environmental analysis of these selected finalists before making its ultimate decisions." *See Surfrider Found. v. Dalton,* 989 F.Supp. 1309, 1325 (S.D.Cal.

---

**28.** The following statement in *Environmental Defense Fund v. Tennessee Valley Authority* is applicable to this case:

> N.E.P.A., although rigorous in its requirements, does not require perfection, nor the impossible. In assessing the adequacy of such statement, practicability and reasonableness are to be taken into account along with the broad purposes of the Act to preserve the values and amenities of the natural environment. This involves of course a balancing process .... The specific objections of appellants to the final statement appears to us to be overly technical and hypercritical.

*Envtl. Defense Fund v. Tennessee Valley Auth.,* 492 F.2d 466, 468 n. 1 (6th Cir.1974) (citations omitted).

**29.** NEPA established the CEQ to advise the President on environmental issues and to oversee the implementation of NEPA. *See* 42 U.S.C.A. § 4342 (West 1994); 40 C.F.R. § 1500 *et seq.* (2000).

**30.** 40 C.F.R. § 1502.14 states:

> This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:
> (a)Rigorously explore and objectively evaluate all *reasonable* alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
> (b)Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
> (c)Include reasonable alternatives not within the jurisdiction of the lead agency.
> (d) Include the alternative of no action.
> (e)Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
> (f)Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14 (2000) (emphasis added).

1998). Federal regulations require that the agency devote "substantial treatment" to and "rigorously explore and objectively evaluate all reasonable alternatives," and briefly discuss the reasons for the exclusion of the alternatives eliminated from detailed study. *See* 40 C.F.R. § 1502.14(a) & (b) (2000). The procedural requirement that an agency consider all reasonable alternatives is, however, "bounded by some notion of feasibility." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). As the Supreme Court has stated:

> Common sense ... teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. 1197. "An EIS is satisfactory if the treatment of alternatives, when judged against a 'rule of reason,' is sufficient to permit a reasoned choice among the various options." *Druid Hills Civic Ass'n*, 772 F.2d at 713; *see Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180–81 (9th Cir.1990).

In this case, Plaintiffs allege that Defendants violated the provisions of 40 C.F.R. § 1502.14(a) and (c) by failing to consider any alternative means for protecting downtown Dallas from flooding, such as building up the existing Dallas Floodway by approximately two feet, when the majority of the DFE project's economic benefits [31] resulted from protecting downtown Dallas from flooding.[32] (Pls.' Mot. for Summ. J. at 30.) Plaintiffs assert that the COE evaluated an alternative that proposed raising the existing Dallas Floodway and that this alternative had the best benefit-to-cost ratio of any other alternative considered by the COE, including the final recommended plan. (Pls.' Mot. For Summ. J. at 33; *see* HCAR 16, 160, 15792, 16035, 193.) Plaintiffs assert that there is no discussion in the 1999 EIS or in the administrative record as to why this alternative was rejected. Plaintiffs contend that, under applicable regulations, the COE was required to give the reason for its rejection of this alternative.

Defendants argue that the reason that they did not consider in the 1999 EIS the alternative of building up the existing Dallas Floodway is because the COE did not have authorization under the DFE project to design or construct improvements to the existing Dallas Floodway. In addition, Defendants contend that such an alternative was not reasonable because it would not provide flood-reduction benefits to the DFE project area, which was a main purpose of the DFE. project. (Defs.' Resp. to Pls.' Mot. Summ. J. at 19.) Thus, the COE was under no obligation to consider it.

 The first step in identifying reasonable alternatives is to define the pur-

---

**31.** Plaintiffs assert that because over half of the economic benefits for the adopted DFE project were obtained by addressing the flooding issues associated with downtown Dallas, the raising of the Dallas Floodway was a viable, less expensive basis for realizing the same economic benefits.

**32.** In their cross motion for summary judgment, Defendants also discuss Plaintiffs' claim that the COE violated NEPA by failing to consider an alternative location for the channel that would avoid the damage to the Great Trinity Forest. Defs.' Mem. at 37. Because Plaintiffs never specifically address this issue, the Court will not analyze it.

pose of the proposed action. *See City of Carmel–By–The–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). In the 1999 EIS, a section titled "Study Purpose and Need" states:

> The primary purpose of this study was to respond to a request by the city of Dallas to re-activate the authorized Dallas Floodway Extension Project. Following the severe flood event of 1989, the city of Dallas requested reactivation of the authorized Dallas Floodway Extension project. The project was reactivated in 1990 under the provision that a general reevaluation be conducted prior to construction. This reevaluation was required due to new environmental and economic criteria, as well as significant land use changes within the study area.

(HCAR at 18.) The authorized DFE project "consisted of a combination flood control channel and floodway levees which would provide a Standard Project Flood (SPF) level of protection[, and] consisted of a 22–mile levee and floodway system with a 9.1 mile residual channel along the Trinity River, 4.1 miles of channel improvements along White Rock Creek, and 5.4 miles of channel improvements to divert Five Mile Creek." [33] (HCAR at 17.)

The EIS indicates that the COE considered a wide number of alternatives, including non-structural and structural alternatives, in the process of selecting the LPP. (HCAR at 70–153.) Plaintiffs complain that the EIS failed to include the alternative of building up the existing Dallas Floodway or discuss the reason this alternative, which had been previously considered by the COE, was eliminated from consideration. With respect to Plaintiff's first complaint, as stated above, the COE is only required to include *reasonable* alternatives in their EIS. Although the alternative of building up the existing Dallas Floodway may have provided additional flood protection benefits to downtown Dallas and the other areas protected by the levees, this alternative would not have provided any benefits to the areas in the DFE project area, which are downstream from the areas protected by the Dallas Floodway. The main purpose of the DFE project, although broadened to include environmental and recreational features, is to expand flood protection for those areas that are downstream from the Dallas Floodway. Consequently, in light of this purpose, the COE was not unreasonable in failing to include building up the Dallas Floodway as an alternative in the EIS. *See Headwaters v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180–81 (9th Cir.1990) (stating that an agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives).

■ Also without merit is Plaintiffs' second complaint that, because the COE

---

**33.** In addition, a section in the 1999 EIS titled "Planning Objectives" states:

> The planning objectives for the Dallas Floodway Extension General Reevaluation study are as follows:
>
> [ ] Reduce flood damages, provide better health and safety measures, reduce emergency services, reduce potential for loss of life due to high velocity flows, reduce isolations caused by flood waters, reduce overtopping of bridges and roads along the Trinity River, and reduce the loss of jobs and/or wages caused by flooding from the Trinity River within the city of Dallas.
>
> [ ] Preserve and protect existing environmental and aesthetically pleasing areas and maintain, as much as possible, the existing vegetation and wildlife habitat along the Trinity. The channel portion of the Trinity River is possibly the largest remaining natural channel within Dallas.
>
> [ ] Preserve and/or protect historically and culturally significant areas.
>
> (HCAR. at 71.)

had studied such an alternative while evaluating and developing the DFE project, the provisions of 40 C.F.R. § 1502.14(a) required the COE to briefly discuss in the 1999 EIS the reasons this alternative was eliminated. Even if the COE had at some point considered raising the Dallas Floodway, the COE is only obligated to discuss in the EIS for the DFE project why reasonable, but undesirable, alternatives to the DFE project were eliminated. *See* 40 C.F.R. § 1502.14(a); *City of Carmel–By–The–Sea,* 123 F.3d 1142, 1158 (noting that at least a few of the proposed alternatives previously considered and rejected in the draft EIS were not included in the final EIS). Because the alternative of raising the existing Dallas Floodway did not reasonably meet the purposes of the DFE project, the COE was not required to consider it, much less discuss the reasons for its elimination from consideration. Consequently, the Court concludes that the COE was not arbitrary or capricious in failing to include in the 1999 EIS the alternative of raising the existing Dallas Floodway or briefly discussing the reasons for the elimination of this alternative. Thus, Defendants are entitled to summary judgment on this issue.

C. *Count III: Violation of NEPA by Failing to Consider (1) "Connected Actions" and (2) "Cumulative Impacts"*

"To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts." 40 C.F.R. § 1508.25 (2000). Specifically, the agency shall consider connected, cumulative, and similar actions, alternatives and mitigating

measures, and direct, indirect, and cumulative impacts. *Id.* The section on connected actions states:

Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1) (2000). The section on cumulative actions states, "Cumulative actions, which when viewed with other *proposed* actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2) (2000) (emphasis added). As discussed in section III.B.1. *supra,* "cumulative impact" is defined as:

the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable *future* actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (2000) (emphasis added).

1. *Connected Actions* [34]

▮ Plaintiffs assert that the COE violated NEPA by failing to analyze other

---

**34.** The Court notes that the difference between "cumulative impacts and actions" and "connected actions," which was discussed in the preceding section, is somewhat confusing.

One court has described connected actions as follows:

Actions are *connected* if they (i) "[a]utomatically trigger other actions which may require environmental impact statements,"

foreseeable future projects that are connected to the DFE project. Plaintiffs claim that the Trinity River Corridor project, the Chain of Lakes, the Trinity Parkway, the Woodall Rogers Bridge, the Elm Fork Levee project and, the Great Trinity Forest are "connected" actions under NEPA and, thus, are required to be analyzed in a single EIS. Plaintiffs claim that they are connected because of the following reasons: (1) financial support for all of these projects, including the DFE project, was obtained through a single bond package known as Proposition 11 that was passed by voters in a May 1988 bond election [35] (*see* HCAR at 14806, 15541); (2) a document in the administrative record identifies the "interdependencies" between these projects in fourteen separate categories, including the DFE Lamar levee being a necessary element for the Trinity Parkway, the Trinity Parkway being built on material excavated from the Chain of Lakes, and the Trinity Parkway hydraulic impacts being mitigated by the construction of the Chain of Lakes (*see* HCAR at 14816); (3) the HEC–1 and HEC–2 analysis used by the COE in the DFE project study area is based on the model devel-

oped as part of the Upper Trinity River Feasibility Study; (4) the fact that the Upper Trinity River Feasibility Study is cross-referenced in many places in the administrative record, including in the 1999 EIS; (5) and notes and descriptions of meetings in which these projects were discussed in connection with each other and decisions were made that affected more than one of the projects (*see, e.g.,* HCAR at 15676–77, 15712–13). Plaintiffs further argue that they believe the DFE project is the baseline for the other projects and that the DFE project was chosen to be built first in order to preserve the economic benefits of the project of protecting downtown Dallas. (Pls.' Br. at 39.)

On the other hand, Defendants argue that the DFE project is not a connected action because: (1) it "was authorized as a stand-alone project to reduce flood damage in certain sections of the City of Dallas[;]" (2) "[i]ts authorization was not dependent on or related to other proposed projects[;]" (3) "[i]ts authorizations [sic] did not automatically trigger other actions that would require an environmental impact statement[;]" and (4) "[t]he project was not dependent on other action taken either

---

(ii) "[c]annot or will not proceed unless other actions are taken previously or simultaneously," and (iii) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). Connected actions are "links in the same bit of chain"; unconnected actions are "separate segments of chain." *Northwest Resource Info. Ctr. v. Nat. Marine Fisheries Serv.,* 56 F.3d 1060, 1068 (9th Cir.1995). For example, if each project could exist without the other, such as a golf course and a proposed resort, then the projects are not connected. *Id.* Similarly, if one phase of a multi-phase project is independent of subsequent phases, i.e., it would be rational to under take the first without ever undertaking the subsequent phases, then the phases need not be connected.

*North Cascades Conservation Council,* 98 F.Supp.2d at 1198–99.

**35.** Proposition 11 is described as follows:
 The issuance of $246,000,000 general obligation Trinity River Corridor Bonds. Project to include floodways, levees, waterways, open space, recreational facilities, the Trinity Parkway and other related necessary and incidental improvements to the Trinity River corridor.
(HCAR at 14806 *.)
*The Court notes that there is a duplication in the administrative record of certain document numbers. Volume 27 contains HCAR 14748 thru 15556. Volume 41S contains HCAR 14182 thru 14865. In other words, HCAR 14748 thru 14865 are contained in both volumes. Any references in this order to any of the documents contained in both volumes are to the documents in Volume 27.

previously or simultaneously in order to proceed." (Defs.' Mem. at 42.)

According to a document detailing the various propositions included in the 1988 capital bond election, the Trinity River Corridor Project is made up of several "interdependent projects that are to be implemented over 10 years, including the DFE project, the Elm Fork Levee,[36] the Trinity Corridor Transportation Improvements,[37] the Great Trinity Forest,[38] and the Chain of Lakes." [39]

Based on the above three factors and the descriptions of the various projects, the Court concludes that the DFE project and the other projects, although obviously

36. The Elm Fork Levee is described as follows:

> [A] joint project of the City and the U.S. Army Corps of Engineers (USACE) for development of a six-mile levee of 15–18 feet in height extending generally along Luna Road from Royal Lane to the vicinity of California Crossing and east to Bachman Lake. The levee system will provide Standard Project Flood protection to 800 acres of floodplain within the Stemmons North Industrial District and 600 existing structures valued in excess of $700 million. The levee will utilize material excavated from the "Chain of Lakes". Regional trails for transportation and recreational use will link neighborhoods and high employment areas.

(HCAR at 14813.)

37. The Trinity Corridor Transportation Improvements project is described as follows:

> [It involves] joint projects of the City of Dallas, the Texas Department of Transportation (TxDOT), and the North Texas Tollway Authority (NTTA). The project will provide funding for City participation in the Trinity Parkway, a 6–8 lane reliever route extending from U.S. 175 on the east, constructed as a one-way couplet within the Dallas Floodway levee system and extending west to connect with S.H. 183 in the area of IH–35E, and for expanding Beckley Avenue to a six lane divided thoroughfare from Singleton Boulevard to one block east of IH–30. This project is under consideration by the North Texas Tollway Authority for development as a toll facility. The construction of the Trinity Parkway reliever route will permit TxDOT to complete improvements to IH–30 and IH–35E (Canyon/Mixmaster/lower Stemmons), including frontage roads, a direct connector between IH–30 and IH–35E, High Occupancy Vehicle (HOV) lanes, elimination of unsafe merge/divide movements, installation of intelligent vehicle systems, and the expansion of lanes in the Canyon within an accelerated fifteen year schedule. The project will also extend Woodall Rogers, as a key element of the reliever, across the Trinity River to Singleton/Beckley Avenue, providing access to the Trinity Parkway, West Dallas, and Oak Cliff.

(HCAR at 14813.)

38. The Great Trinity Forest project is described as follows:

> [It] will implement the Great Trinity Forest Master Plan Concept providing for the development of the Trinity Interpretive Center, an equestrian center, equestrian and nature trails, multipurpose trails to be used for recreation and transportation, boat launches, and trailhead improvements. It also provides for the acquisition and preservation of 2,700 acres of pristine bottomland hardwood forest within the Trinity River Corridor. The Forest is the most likely site recipient for environmental restoration/mitigation required for the Trinity Parkway, the Dallas Floodway Extension Project, and other transportation projects in the Dallas area.

(HCAR at 14813.)

39. The Chain of Lakes project is described as follows:

> [It] will create a series of lakes within the "Dallas Floodway upstream of Corinth Street and extending to the confluence of the Elm Fork and the West Fork of the Trinity River. The lake will increase the Floodway's capacity for floodwater conveyance, will mitigate the effects of the construction of the Trinity Parkway, and will provide material for the construction of the Trinity Parkway and the Elm Fork Levee, as well as creating recreational amenities within the Dallas Floodway. Trail linkages for transportation and recreational use will connect neighborhoods and high employment areas in Oak Cliff, West Dallas, and the Central Business District."

(HCAR at 14813.)

related by geographic features, their association with the Trinity River, and the overall goal of improving the area, are not "connected actions." (*See, e.g.,* HCAR at 11217, 11272, 11273.) First, there is no evidence in the record that the building of the DFE project will automatically trigger any of the other projects. Although all of the projects were approved by the voters in a bond election, such approval does not automatically indicate that they will all be constructed. In addition, there is no evidence, beyond Plaintiffs' speculative belief, that the DFE project cannot proceed unless the other projects are built before or at the same time as the DFE project. Finally, there is no evidence in the record that the DFE project, whose purpose is to provide flood protection to certain areas, is an interdependent part of any of the other projects. *See* 40 C.F.R. § 1508.25(a)(1) (2000). Consequently, because the success or failure of the DFE project does not depend on any of the other projects, the Court concludes that the COE's failure to analyze the other projects in the 1999 EIS was not arbitrary and capricious. *See North Cascades Conservation Council v. United States Forest Serv.,* 98 F.Supp.2d 1193, 1199 (W.D.Wash.1999); 40 C.F.R. § 1508.25(a)(1) (2000).

### 2. *Cumulative Actions and Impacts of Future Actions*

■ Plaintiffs assert that the COE violated NEPA by failing to address in the 1999 EIS the cumulative impacts of the series of projects that are all part of the Trinity River Corridor Project. (Pls. Br. at 34–36.) Plaintiffs claim that the 1999

EIS does not discuss these reasonably foreseeable future projects or any of the possible cumulative environmental impacts resulting from these projects and the DFE project. (Pls. Br. at 36.)

Defendants claim that these future projects were not discussed in the 1999 EIS as cumulative impacts because they were not actually "proposals" and because Defendants "had insufficient detail to provide [a] detailed discussion of cumulative impacts." (Defs.' Mem. at 43.) Defendants further state "that the components of the plans discussed which might impact existing Corps of Engineer projects are areas within the regulatory program of the Corps of Engineers and will not produce adverse cumulative impacts because of existing Corps mandates to disallow projects that would cumulatively adversely impact environmental or economic conditions in or [sic] area of jurisdiction." (Defs.' Mem. at 43–44.) Defendants further point out that the 1999 EIS does discuss the cumulative effect of the proposed Trinity Parkway, which Defendants claim was, at that time, "part of a study to develop a LPP of action to solve transportation problems along the Trinity Corridor in Dallas." (Defs.' Mem. at 44.)

The Court notes that there is some confusion between the parties and in the case law over the terms "cumulative impact" and "cumulative actions" and whether a discussion on cumulative impacts of foreseeable future projects is required only if a foreseeable project has actually been *proposed.*[40] *Compare Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)[41] *with Fritiofson v. Alexander,* 772

---

**40.** A proposal "exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effect can be meaningfully evaluated." 40 C.F.R. § 1508.23.

**41.** The issue in *Kleppe* was whether the Department of the Interior and other federal agencies were required to prepare a comprehensive, regional EIS before granting leases to operate coal mines on federal land in the Northern Great Plains Region, which encompassed parts of North Dakota, South Dakota, Montana, and Wyoming. *Kleppe,* 427 U.S. at

F.2d 1225 (5th Cir.1985),[42] *overruled on other grounds by Sabine River Authority*

*v. United States Dep't of Interior,* 951 F.2d 669 (5th Cir.1992); *see* Terence L. Thatch-

399, 96 S.Ct. 2718. The agencies had already prepared a national programmatic EIS on the entire coal-leasing program. In addition, the Department of the Interior had stated that it intended to prepare a comprehensive EIS on all proposed local coal development projects. The Supreme Court held that the obligation to prepare an EIS is triggered by a "proposal" for major federal action; consequently, the Department of the Interior was not required to prepare a regional EIS because there had been no "proposed" regional action. The Supreme Court stated that "when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Id.* at 410, 96 S.Ct. 2718. In footnote 20, the Court stated:

> At some point in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposal, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

(*Id.*)

Defendants argue that under *Kleppe* they only have to consider the cumulative impacts of *proposed* actions on the DFE project in the EIS. The Court disagrees with this interpretation because the Supreme Court in *Kleppe* was only deciding the limited issue of when the preparation of an EIS was triggered and was not determining the issue before the Court today, which is whether under NEPA the COE is required to analyze in an EIS the cumulative impacts of the proposed project *and* reasonably foreseeable (although not proposed) future actions. The Supreme Court held, based on the regulations, that the preparation of an EIS is only triggered by an actual proposal. In other words, under *Kleppe,* the

COE would not be required to create an EIS for a future project that has not risen to the level of an actual proposal.

**42.** In *Fritiofson,* the suit arose out of a challenge to the COE's decision to grant a permit allowing development on West Galveston Island on the Gulf Coast of Texas. Prior to the lawsuit, several environmental groups had demanded that the COE analyze the cumulative impacts of the immediate permit application in conjunction with other future developments. The COE refused and prepared an Environmental Assessment ("EA") that found the project, standing alone, would not have a significant impact on the environment; consequently, the COE did not prepare an EIS. The district court held that the COE's decision not to prepare an EIS was unreasonable. (Using the "reasonableness test" as the standard of review of an agency's decision not to prepare an EIS, as opposed to the "arbitrary and capricious" test, was overruled by the Fifth Circuit in 1992). The Fifth Circuit Court of Appeals, in reviewing the district court's decision and in an attempt to reconcile the Supreme Court's decision in *Kleppe,* stated:

> Sections 1508.7 and 1508.27 require an analysis, when making the NEPA-threshold decision, as opposed to the EIS-scoping decision, whether it is 'reasonable to anticipate cumulatively significant impacts' from the specific impacts of the proposed project when added to the impacts from 'past, present and reasonably foreseeable future actions,' which are 'related' to the proposed project. The regulation does not limit the inquiry to the cumulative impacts that can be expected from proposed projects; rather, the inquiry also extends to the efforts that can be anticipated from 'reasonably foreseeable future actions.' In other words, when deciding the potential significance of a single proposed action (i.e., whether to prepare an EIS at all), a broader analysis of cumulative impacts is required. The regulations clearly mandate consideration of the impacts from actions that are not yet proposals and from actions—past, present, or future—that are not themselves subject to the requirements of NEPA.

*Id.* at 1243 (citations omitted).

er, *Understanding Interdependence in the Natural Environment: Some Thoughts On Cumulative Impact Assessment Under the National Environmental Policy Act,* 20 ENVTL. L. 611 (1990). In *Oregon Natural Resources Council v. Marsh,* the court attempted to remedy the confusion, explaining as follows:

> The "cumulative impact" regulation requires the Corps to evaluate "the incremental impact of the action when added to other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.7. Although the CEQ guidelines require that "cumulative actions" be considered together in a single EIS, 40 C.F.R. § 1508.25(a)(2), and "cumulative actions" consist only of "proposed actions," *this does not negate the requirement of 40 C.F.R. § 1508.7 that the Corps consider cumulative impacts of the proposed actions which supplement or aggravate the impacts of past, present, and reasonably foreseeable actions.*

*Oregon Natural Res. Council v. Marsh,* 832 F.2d 1489, 1497–98 (9th Cir.1987) (emphasis added), *rev'd on other grounds,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).[43]

**43.** Terence Thatcher, in an article on cumulative impacts, gives a good example of the difference between "cumulative actions" analysis and "cumulative impacts" analysis:

An example is helpful to draw the distinction. The Federal Energy Regulatory Commission (FERC) regulates the development of hydropower on the nation's rivers under the Federal Power Act. FERC issues preliminary permits to persons who wish to study the feasibility of a hydropower project at a particular location, and will issue a hydroelectric license to one who is ready, willing, and able to begin construction of a project.

Assume for a moment that FERC has fifteen applications for licenses before it, all in the same river basin and all with the potential to adversely affect the basin's anadromous fish habitat and fish populations. To build all fifteen likely would do more damage to the fish than completing just one. These applications to build hydropower projects are what the CEQ regulations call cumulative actions—concrete proposals pending before FERC concurrently with potential cumulative impacts on the river's fish runs. They should be assessed together in one comprehensive (Kleppe-style) EIS. The EIS will analyze the individual and cumulative impacts of each project, all the projects together, and will recommend, as a preferred alternative, which of the fifteen projects should be licensed. The cumulative actions are considered for the purpose of cumulative environmental impact assessment and for the purpose of decision making on each proposed action.

Now consider a different situation. FERC has only one application for a hydropower license in the river basin before it.

The projection will adversely affect fish runs. FERC also has ten applications under consideration for preliminary permits to study the feasibility of other hydropower projects in the basin. FERC knows that some of the land on the basin's steep and fragile hillsides is managed for timber harvest. This activity can damage fish habitat as can expected increased irrigation. Finally, the proposed hydropower project lies upstream from a series of preexisting dams, each of which already exacts a toll on the fish that attempt to pass. In this situation, there is only one proposal with potential adverse fish impacts; there are no cumulative actions proposed. The environmental review of the application, therefore, will consider only the one application for decision making purposes.

Before FERC issues any license, however, it must assess the impacts—including cumulative impacts—of the one-dam proposal. FERC should first prepare an Environmental Assessment to decide if an EIS is required. The EA and any subsequent EIS must take into account the present damage to the fish runs from existing dams and address how the new project will further damage them. The actual impacts on the fish runs from the future logging and agricultural development should be addressed also, but only so far as one can reasonably foresee that time cutting or irrigation withdrawals will occur. Similarly, the impacts from the development of the projects under preliminary permits should be included if there is some reasonable basis to believe that some or all of the projects will move forward.

In other words, although federal agencies are given "the primary task of defining the scope of NEPA review and their determination is given considerable discretion, ... cumulative [proposed] actions must be considered together [in one EIS] to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively has a substantial impact." *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir.2000); *see* 40 C.F.R. § 1508.25(a)(2); *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir.1988); *North Carolina Alliance for Transp. Reform*, 151 F.Supp.2d 661, 684–85 (M.D.N.C.2001) (holding that the western and eastern sections of a beltway, because of their geographic proximity and common planning, should have been considered in the same EIS). However, even if a foreseeable, future action is not a proposed action such that it does not need to be analyzed and decided in the same EIS, the cumulative impacts of this foreseeable action nevertheless must be analyzed in the EIS. *See Oregon Natural Res. Council*, 832 F.2d at 1498; Thatcher, *supra*, at 624 (stating that "unlike the obligation to include all cumulative actions in the same EIS (for analysis and decision), the obligation to analyze cumulative impacts is not limited to actual proposals"). *See also Natural Res. Defense Council v. Callaway*, 524 F.2d 79, 87–88 (2d Cir. 1975); *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 175–76 (5th Cir.2000); *Piedmont Envtl. Council v. United States Dep't of Transp.*, 159 F.Supp.2d 260, 290 (W.D.Va.2001); *Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121, 135–37 (D.D.C.2001).

Terence L. Thatcher, *Understanding Interdependence in the Natural Environment: Some Thoughts On Cumulative Impact Assessment Under the National Environmental Policy Act*, 20 ENVTL. L. 611, 624–26 (1990).

The 1999 EIS, in a section in Chapter 2 titled "Interrelationship To Other Proposed Actions," states:

Several proposals within the Dallas area could be considered related to the proposed Dallas Floodway Extension area. The Corps of Engineers has begun studies to address the existing Dallas Floodway and the Stemmons North Industrial area. These studies were initiated to determine if further activities were justified to reduce flood damages within the area and to determine the needs and benefits of ecosystem restoration and other allied measures.

Dallas County has an active Open Space Program in place and, as a result of their activities, extensive acquisitions of key areas along the Trinity River floodplain have occurred. Recently, the citizens of Dallas approved a bond proposal that called for moving forward with actions that would accelerate acquisitions, and other actions that would promote acquisition and preservation of the "Great Trinity Forest."

The Trinity Parkway Corridor Major Transportation Investment Study (MTIS), conducted by the Texas Department of Transportation (TxDOT), was intended to develop a locally-preferred plan of action to solve transportation problems along the Trinity Corridor in Dallas, and to integrate with community plans and goals for the Trinity River Floodway, a major open space resource. The study started with identification of the transportation problem and ended with the selection of a locally-preferred alternative.

The study was focused on transportation needs in the IH–30/IH–35E interchange on the west edge of downtown

Dallas, locally known as the "Mixmaster," and the depressed segment of IH–30 south of the downtown, locally known as the "Canyon." The study area was enlarged downtown to cover a reasonable area of influence of the Canyon and the Mixmaster on area transportation facilities.

The Recommended Plan of Action, as presented in the "Study Report, Trinity Parkway Corridor, Final Report, March 17, 1998", is comprised of seven elements in the corridor, including the Trinity Parkway, extension of Woodall Rogers Freeway, and improvements to IH–30/IH–35E. Details of the study and recommended elements can be found in the referenced document.

Of the actions included within TxDOT's recommended plan, a proposed Trinity Parkway along the Trinity River would interface extensively with existing Corps of Engineers project features, including the Dallas Floodway levees. Furthermore, the initial alignment shown in the TxDOT document would run generally parallel to the Southern Pacific Railroad tracks near Lamar Street within the DFE study area.

The transportation planning will continue for several years before being finalized. TxDOT has recognized that additional environmental studies would be needed, and it is likely that an Environmental Impact Statement would be required to address the myriad of issues that the proposal would bring forward. In addition, should any aspect of the plan involve the discharge of dredged and fill material into the waters of the United States, including adjacent wetlands, prior approval from the U.S.

Army Corps of Engineers would be required. Additionally, all proposed work within the limits of the existing Dallas Floodway or the Dallas Floodway Extension, if constructed as proposed, would be evaluated and approved by the U.S. Army Corps of Engineers. The evaluation of the proposed project would ensure there are no detrimental affects on the flood carrying capacity of [sic] ability to maintain the floodway. Furthermore, any development activity within the Trinity River Corridor must obtain a Corridor Development Certificate prior to construction.

(HCAR at 49–50.) With respect to any other projects, the section titled "Cumulative Impacts" in the 1999 EIS states:

This section analyzes the proposed project in the context of current and future trends in the Upper Trinity River Basin. The purpose of this section is to assess the cumulative impacts of the proposed action to the study area, when combined with other known actions in the vicinity of the Dallas Floodway Extension area, as described in the "INTERRELATIONSHIP WITH OTHER PROPOSED ACTIONS" section in Chapter 2. The proposed action, including environmental mitigation, makes little or no contribution to regional trends that are of concern in assessing cumulative impacts.

(HCAR at 188.)

In this case, it is clear that the COE failed to perform the cumulative-impact analysis that is required under NEPA. Regardless of whether any of the other projects constitute actual proposals,[44] there is a reasonable basis to believe that some or all of them will be implemented. The

---

**44.** Although the Court does not have to decide the issue of whether any of the other projects are "proposed actions" in order to find that the COE violated the NEPA by failing to discuss the cumulative impacts of the other rea-

sonably foreseeable future projects and the DFE project, on remand the COE should determine if any of the other projects are in fact "proposed actions" that must be considered together in a single EIS.

financing for the projects was passed by voters in a bond election in 1988. Obviously, the COE is, at a minimum, evaluating the feasibility of these other projects. In fact, in their answer, Defendants admit that the Trinity Parkway, the Woodall Rogers Bridge, and the Chain of Lakes are "reasonably foreseeable future actions." (*See* Defs.' Am. Answer at 24.) However, the COE has failed to discuss in the 1999 EIS the cumulative impacts of any of these other projects and the DFE project as required by NEPA.

Defendants do mention the Trinity Parkway project and the Great Trinity Forest project in the 1999 EIS and discuss how these projects are related to the DFE project. Defendants then make blanket statements that any other "proposed work" would be evaluated and approved by the COE before construction to ensure that there are no detrimental effects to the DFE project and that the "proposed action, including environmental mitigation, makes little or no contribution to regional trends that are of concern in assessing cumulative impacts." These statements are conclusory, however, and fail to meet NEPA's requirement that an agency take a "hard look" at the environmental consequences, including the cumulative impacts, that a project will have on the environment. Even if the exact future of these other projects is uncertain, uncertainty alone does not excuse the COE's failure to address the cumulative impacts of these projects in connection with the DFE project. *See Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C.Cir.1973) (stating that "we must reject any attempt by agencies to shirk their responsibility under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry'"); *see also Natural Res. Defense Council, Inc. v. Callaway,* 524 F.2d 79, 87–90 (1975) (rejecting the district court's conclusion that the environmental impact of the proposed project could be considered in isolation from other similar projects in the same area that the district court characterized as tentative or speculative in nature). Obviously, the reasonably foreseeable construction of more levees, bridges, and highways in the same geographic area as the DFE project will create environmental "cumulative impacts" that should have been considered in the 1999 EIS.

Defendants' argument that the "projects were evaluated to the extents known" is also incorrect. (Defs.' Resp. at 21.) Most of the projects were not even *mentioned,* much less *evaluated.* The future projects that were mentioned were only discussed in conclusory terms. *See Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1380 (9th Cir.1998) (stating that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definite information could not be provided"). Furthermore, Defendants' claim that the cumulative impacts of the other projects were not analyzed because the projects had not been developed to the point where foreseeable cumulative impacts could be determined is not persuasive. *See Neighbors of Cuddy Mountain,* 137 F.3d at 1380 (stating that it is not "appropriate to defer consideration of cumulative impacts to a future date" because "NEPA requires consideration of the potential impact of an action *before* the action takes place"). According to the federal regulations, even if an agency has incomplete or unavailable information, the agency is required to reveal the facts and explain that such information is incomplete or unavailable. *See* 40 C.F.R. § 1502.22 (2000). The discussion of cumulative impacts in the 1999 EIS fails to satisfy NEPA's requirements because it consists only of "conclusory remarks, statements that do not equip a decisionmaker to make an informed decision about alternative

courses of action, or a court to review the [COE's] reasoning." *See Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 138 (D.D.C.2001). As a result, the Court will remand this matter to the COE for further consideration of the cumulative impacts of other similar, reasonably foreseeable future projects in the same geographic area as the DFE project. Consequently, Plaintiffs are entitled to summary judgment on this issue.

D. *Count IV: Violation of the APA by Failing to Follow the 1988 Record of Decision*

Plaintiffs allege that the COE violated the APA by failing to follow criteria established in the 1988 ROD in evaluating projects within the SPF floodplain of the Trinity River. (Pls. Br. at 40–41.) "In the mid–1980's the Fort Worth District of the COE determined that it was necessary to develop a regional perspective of the potential flood-related and environmental impacts from the numerous development and flood abatement projects being proposed along the Trinity River in the DFW Metroplex Area." (Pls. Br. at 40; *see* Defs.' Answer at 8.) As a result, the COE undertook the preparation of the 1987 REIS, which was developed for the "sole purpose of establishing a permitting strategy for the Trinity River and its tributaries." (HCAR at 3160.) In the 1987 REIS, the COE found that the many individual development projects had the potential to cause significant cumulative impacts on flood levels and on the environment. (*Id.*) In 1988, the Fort Worth District Engineer of the COE issued a ROD that established specific criteria for evaluating certain projects within the Trinity River floodplain. The criteria established by the 1988 ROD that are applicable to this suit are as follows:

a) No increase in the 100–year or SPF water level will be allowed,

b) The maximum allowable loss in floodplain storage capacity for 100–year and

SPF discharges will be 0% and 5% respectively.

c) Erosive velocities will not be created or increased on-site or off-site, and

d) The minimum design criteria for the top of levees protecting urban development is the SPF plus 4 feet.

(Pls.' Br. at 41; *see* Pls. Compl. at 17; Defs.' Answer at 8.) The 1988 ROD further stated that "[v]ariance from the criteria would be made only if public interest factors not accounted for in the [1987] Regional EIS overwhelmingly indicate that the 'best overall public interest' is served by allowing such variance." (HCAR at 3161.)

Plaintiffs allege that the DFE project violates at least two of the criteria established in the 1988 ROD and that a variance from the criteria was never obtained as required. Defendants, on the other hand, claim that the DFE project is a federal project that is exempt from the 1988 ROD. Furthermore, even assuming that the 1988 ROD was applicable to the DFE project, Defendants assert that they are either in compliance with the 1988 ROD's criteria or were granted a variance to the criteria by the 1999 ROD. (Defs.' Mem. at 45–46.)

Section 301 of the Clean Water Act ("the Act"), 33 U.S.C. § 1311, states that the discharge of any pollutant by any person shall be unlawful, except in compliance with § 404 of the Act, 33 U.S.C. § 1344, and other sections. Under section 404(a) of the Act, the Secretary of the Army is directed by Congress to regulate the discharge of dredged and fill material into all waters of the United States. *See* 33 U.S.C. § 1344(a) (West 2001). (Defs.' Mem. at 45.) Under 33 U.S.C.A. § 1344(a), anyone seeking to discharge dredged or fill material into the navigable waters of the United States is required to obtain a permit from the Secretary of the Army acting through the Chief of Engi-

neers of the Corps of Engineers. *See* 33 U.S.C.A. § 1344(a) (West 2001). However, certain federal projects are exempt from the permit requirement pursuant to 33 U.S.C.A. § 1344(r), which states:

The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section ... if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or

an appropriation of funds for such construction.

33 U.S.C.A. § 1344(r) (West 2001).

In this case, Defendants argue that although the DFE project may "insignificantly" violate two of the criteria established in the 1988 ROD,[45] the DFE project is exempt from the permit requirement and the criteria in the 1988 ROD. Defendants contend that the 1988 ROD was "issued to establish a regional baseline for the exercise of the COE's regulatory program." (Defs.' Mem. at 45; *see* HCAR at 186). In other words, Defendants argue that because the purpose of the 1988 ROD was to establish criteria to be used in making permit decisions, the DFE project is exempt from such criteria because it is a federal project that is exempt from the permit requirements under 33 U.S.C. § 1344(a). Although the 1999 EIS is somewhat unclear as to whether the COE is required to obtain a variance from the 1988 ROD (*compare* HCAR at 186[46] *with* HCAR at 187[47]), Plaintiffs basically ignore

---

**45.** Defendants state that the 1999 EIS "on page 6–17 recognized that the DFE project would result in a small increase from the criteria requiring mitigation for reduction of valley storage and no allowable rise in the 100–year and SPF flood elevations." (Defs.' Mem. at 48.)

**46.** Page 6–13 of the 1999 EIS states:

The Corps of Engineers has been directed by Congress under Section 404 of the Clean Water Act (33 USC 1344) to regulate the discharge of dredged and fill material into all waters of the United States, including adjacent wetlands. The intent of Section 404 is to protect the nation's waters from indiscriminate discharge of material capable of causing pollution, and to restore and maintain the chemical, physical and biological integrity of these areas. Although the Corps of Engineers does not issue itself permits for proposed activities which would affect waters of the United States, the Corps must meet the legal requirements of the Act. Section 404(r) of the Clean Water Act waives the requirement to obtain a State

Water Quality Certificate provided information on the effects of the discharge of dredged or fill materials into waters of the United States, including the application of the Section 404(b)(1) guidelines, are included in an environmental impact statement (EIS) on the proposed project, and the EIS is submitted to Congress before the actual discharge takes place and prior to authorization or appropriation of funds for project construction. A Section 404(b)(1) analysis has been completed and is presented in Appendix F.

(HCAR at 186.)

**47.** Page 6–14 of the 1999 EIS states:

The ROD also provided that variance from the criteria would be made only if public interest factors not accounted for in the [1987 REIS] overwhelmingly indicated that the "best overall public interest" is served by allowing such variance. During the review of this project proposal by the Corps, other agencies, communities and the public, it will be determined if it meets the ROD criteria or whether resolution of flood-

this portion of Defendants argument.[48] Plaintiffs thus have not met their burden of proof to show that Defendants violated the APA. *See Marita*, 46 F.3d at 616. Consequently, the Court concludes that Defendants' motion for summary judgment on count IV should be GRANTED.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that Plaintiffs' Motion for Summary Judgment [doc. # 42–1] is PARTIALLY GRANTED in that this matter is REMANDED to the COE for further consideration of the cumulative impacts of other similar, reasonably foreseeable future projects in the same geographic area as the DFE project.

It is further ORDERED that the defendants are enjoined from engaging in any further action related to the construction of the DFE project until such time as the defendants have complied with this order, the NEPA, and all other applicable laws.

It is further ORDERED that Defendants' Cross Motion for Summary Judgment [doc. # 44–1] is PARTIALLY GRANTED in that they are entitled to summary judgment on all counts except as noted above.

ing problems of this frequency and magnitude should be deemed as an overriding concern, and if a variance from the [1988] Record of Decision should be allowed as being in "the best overall public interest." (HCAR at 187.)

48. Plaintiffs, in their response, state that "Defendants contend that they are exempt from permitting requirements under the 1988 ROD and alternatively that the [1999 EIS] grants an exemption from the 1988 ROD." (Pls.' Resp. at 23.) Plaintiffs then cite a variety of cases dealing with an agency's obligation to follow its own policies and focus their analysis on the fact that Defendants admit that the DFE project did not meet the criteria of the 1988 ROD and never obtained a variance from such criteria. Plaintiffs fail to address, however, Defendants' contention that they were exempt from the permitting requirement and the 1988 ROD's criteria.